[S. C., ante, 69.]
The writ in this cause issued the 7th of March, 1809, for Alexander Johnston as plaintiff against these defendants; which was executed and returned to April term, 1809, of the County Court of Davidson. The declaration was founded upon a bond dated the 14th of January, 1800, for conveying a certain tract of land to the plaintiff by the intestate Tyree Harris, with warranty, which the declaration states he did not convey, nor his administrator, although specially required at Nashville, 28th February, 1809. At April sessions, 1810, the defendant pleaded covenants performed, plene administravit, and no assets, upon which issues *Page 225 
were joined. A verdict was rendered on the same term upon all these issues for the plaintiff; damages assessed and judgment given to be levied of the goods of the intestate, c. This cause was then removed by certiorari into the Circuit Court, whichcertiorari was dated the 14th March, 1811. In September, 1811, the plaintiff having died, his executor the present plaintiff, was made a party in his place; and the cause was continued from time to time until November term, 1814, when the Court gave leave to tile additional pleas. One of these pleas states the death of Harris, and administration granted to Susanna Dew, in April term of the Court of Pleas and Quarter Sessions for the county of Davidson, in the year of our Lord 1802, who advertised within two months, c. The defendant, Dew, stated on an affidavit that he never knew till then (November, 1814) of the materiality of the plea. The replication to the plea says, she did not so advertise, and issue was thereupon joined. The defendant's other plea stated that the plaintiff as executor, or his testator did not make claim of said demand, nor sue within seven years next after the death of Tyree Harris; upon this plea there is a demurrer and joinder, which however was withdrawn, and a replication filed, stating a demand by Alexander Johnston, 28th February, 1809, within seven years next after the death of Harris, and that the defendant promised to pay, c. The rejoinder says he did not demand by bringing suit within seven years; the plaintiff demurred, and the defendant joined in demurrer. In November term, 1814, a bill of exceptions was signed, it excepted to the opinion of the judge of the Circuit Court for admitting these pleas at That late period. In May, 1815, there was a verdict for the plaintiff upon the issues of fact, and the cause by consent was removed into this court as to this exception. It is to be remarked that the action was commenced on the 7th of March, 1809, the pleas were offered and *Page 226 
received November term, 1814. The trial in the County Court was in April, 1810. On the 14th March, 1811, the certiorari issued returnable to September term, 1811, which commenced on the second Monday of that month. The record shows that the session of the County Court commenced on the third Monday of April, 1809, and also on the third Monday of January, 1809. September term, 1810, of the Circuit Court intervened between the trial in April, 1810, and the date of thecertiorari. The application for the certiorari was made, as is supposed, some time during the March term of the Circuit Court in the year 1811. For what cause it issued does not appear. The application, after such a lapse of time, ought to have shown the strongest possible reasons for not applying at the first term after judgment. Judgments ought not to be exposed to avoidance, indefinitely, when the evidence to support them is extinct. Such a practice would render nugatory all the judgments which the courts could give; and make plaintiff's liable to refund by writs of restitution or actions upon the case at any distance of time, and whenever it is discovered that: the original evidence used at the trial could no longer be produced. With such properties, the certiorari would become the most mischievous engine of injustice that ever was employed in forensic proceedings. Whereas, like other useful things when kept within the bounds of moderation, it is productive of much good; as it must be admitted to be when employed to obviate the tricks which aim at the prevention of remedies, and of trials allowed by law, to the plaintiff in the certiorari, who otherwise would be defeated of them. No objection, however, being made on the return of thecertiorari; but, on the contrary, the plaintiff having applied for a new party to be substituted in place of the original plaintiff, who had died in the mean time, it must now be understood, that the cause was removed into the Circuit Court by *Page 227 
consent; and thus a difficulty is surmounted which otherwise would have been very formidable.
As to the lateness of the time of receiving the additional pleas. If they are so material as to be decisive of the controversy; and if also the Court can be satisfied of the truth of them, then, at any time before verdict, they ought to be received, otherwise irreparable injustice might be done to the defendant through his own ignorance, or the mistake or unskilfulness of counsel. For it is doubtful whether he could be relieved in equity. And if be could, courts of law, when they have it in their power, ought rather to afford to the parties before them the necessary relief than send them to other courts, thereby protracting litigation, and accumulating expense and vexation. In this spirit is conceived the Act of 1809. c. 49, section 21; "no proceedings shall be quashed or abated, for any omission; defect, or imperfection, but the said courts, namely, the circuit courts and courts of pleas and quarter sessions, shall and may from time to time permit either of the parties to amend, c., upon such terms, as they respectively in their discretion, and by their rules, shall prescribe. "The same spirit is manifested in 1809, c. 126, section 10;" no judgment, decision, or decree of the circuit courts shall be reversed in the Supreme Court unless for errors which affect the merits of the judgment, decision, or decree complained of." To be sure heavier terms ought to be imposed on a stale than on a recent application to amend the pleadings, such terms as will preclude a suspicion of meditated delay, and as are adequate to the purpose of deterring suitors from the practice of delay. In the instance before us, the Court was not applied to for such terms, which is another proof that the parties came into this court by consent. The pleas received have the sanction of former decisions for their materiality, and that is ground enough for the Circuit Court to conceive them to be material and decisive until a *Page 228 
contrary decision shall take place. The affidavit offers a tolerable excuse for not pleading the same matters before. This record at that time showed the death of the obligor, and the time of commencing the action against his executors, which prima facie prove the lapse of seven years between his death and the commencement of the action. Therefore both the materiality and truth of the plea didprima facie appear, and the application was before the verdict or trial. It can not be said then, correctly, that the Circuit Court erred in receiving the additional pleas.
As to the pleas themselves and the pleadings upon them. One question for discussion is, whether the rejoinder be a departure from the plea, and, if a departure, what is the effect thereof by the law of this State? A departure is where the defendant sets up one matter of defence in his plea, and afterwards another in the rejoinder. If this were allowable, he might set up another in the rebutter, and when it came to his turn in the course of pleading to speak again, he might resort to a new matter still, and so never come to an issue at all, either of law or fact, and might never have judgment against him. 2 Willes, 98, 304 a. According to the law as it stood till our acts of 1809, a departure was matter of substance for which, on a general demurrer, the Court would give judgment against him who was guilty of it. And was not such matter which by the 4 5 Anne, c. 16, sec. 1, the Court, upon demurrer, was to overlook in giving judgment according to the right of the case, so as sufficient matter appear on the pleadings. That it is matter of substance by the law, as it stood till 1809, is proved by Saund. 84, note, Willes, 25, 27, 638; 1 Wils. 122; 2 Wils. 96; 4 T. 504. And were it not for these acts of our own legislature, the Court would not be bound to give judgment upon the demurrer for the plaintiff. For certainly to say he did not demand, and then to say he did not demand by bringing suit, are two distinct *Page 229 
matters and in legal phraseology a departure. If we give judgment upon that alone, it may not be a judgment upon the merits as contemplated by the Act of 1809. The real foundation may be mistake or want of skill in setting forth or selecting, as a defence, the matter which is most proper to be relied on. And therefore judgment ought, not to be rendered upon the departure alone. But rather a repleader should be directed to put in issue the matters that are material, and go to the merits and so decide the cause. If we go back to the replication, that decidedly contradicts the plea; the defendant should have taken issue upon it. The matter of the replication is unanswered; the plea is relinquished by the departure. And then upon what is the Court to give judgment? It must be given against him who has made the first default in pleading by neglecting to give a sufficient answer to sufficient matter alleged against him. The defendant has not given any sufficient answer to the plaintiff's replication; and that being sufficient we must leave the rejoinder and go to that, and so on to the plea; and; if that be insufficient or abandoned, then to the declaration, and give judgment upon that. If that be insufficient, we must then give judgment for the defendant. We must disjoin all the unsound parts of the pleadings, and found our judgment upon the sound parts of them. In the case before us if the matter of the plea be a good legal defence, it is denied by the replication, and, that being not controverted, judgment ought to be for the plaintiff. If the matter of the plea be not good, then of course judgment ought to be for the plaintiff, unless it can be maintained that the pleadings ought to be amended.
This is an adjourned cause pursuant as was supposed to the Act of 1809, c. 26, section 9, "cases agreed may by the consent of parties be adjourned to the Supreme Court." And what is this court to do upon an adjourned cause? It must act upon it in the same *Page 230 
way as the Circuit Court ought to have acted upon it had it not been adjourned; In cases of removal by writs of error "the Court upon reversal is to give such judgment as the Circuit Court should have given, except where damages are to be assessed, c., and in such case to remand the cause." 1809, c. 49, section 27. The same rule is to be observed in appeals in the nature of writs of error; which appeals are introduced by 1811, c. 72, section 1, and the Circuit Court, after ascertaining the insufficiency of the rejoinder and the abandonment of the plea, ought to have heard an application for leave to join issue on the replication, and if that court could have been satisfied, by affidavit, that there had not been a demand as stated in the replication within seven years, should have granted leave to join such issue; or, if not thus satisfied by affidavit, should have given judgment for the plaintiff.
That would lead us to consider whether the plea, supposing it to be true, would bar the plaintiff. For if it would not be a bar, after issue joined and found for the defendant, it could be of no use in deciding the cause; and the Court ought not to inquire into it because of its immateriality, but should give judgment for the plaintiff.
If the plea be immaterial, and that be decided by this court, then the defendant will not be at the expense of establishing its verity. If decided to be material, the only time which can be consumed will be that employed in ascertaining the truth of the plea. It is therefore proper now to determine, as it was expected we should do on demurrer, whether the plea, if true, be a good one or not in law to bar the plaintiff's demand. It is founded upon the Act of 1715, c. 48, section 9; "Creditors of any person deceased shall make their claims in seven years after the death of such debtor; otherwise such creditor shall be for ever barred. And if it shall happen that any sum or sums of money shall hereafter remain in the *Page 231 
hands of any administrator after the term of seven years shall be expired, and not received by any of kin to the deceased, or by any creditor in that time, the same shall be paid to the church-wardens and vestry to and for the use of the parish, where the said money shall remain." By the Act of 1784, c. 23, section 2: "As soon as the administration is finished and no creditor shall make any further demand, it is to be deposited in the treasury, subject to the claim of creditors and distributees, without limitation of time."
In order to understand the ninth section of the Act of 1715, c. 48, we must look to the situation of executors and administrators at and after the time of its passage up to the year 1789.
Before the Act of 1715, executors were in some cases entitled to the surplus of the personal estate undisposed of by the will. This act does away that rule in part. Sect. 7: "No executor or administrator shall take or hold himself (according to the nature of the appraisement) more of the deceased's estate than amounts to his necessary charges and disbursements, and such debts as he shall legally pay within twelve months after administration granted. But all such estate, so remaining, shall immediately after the expiration, thereof be equally and indifferently divided and paid to such persons to whom the same is due by this act or the will of the deceased; such person or persons, or some other for them, giving good security," c. That part of the rule which remains is where there is no legatee nor creditor, nor next of kin, to whom it can be paid. The executor is not directed as the administrator is to pay it into the treasury, and therefore must keep it himself.
By this Act of 1715, the executor or administrator was to pay over the estate to legatees and distributees after the expiration of the one year; and was liable to creditors notwithstanding the intermediate *Page 232 
insolvency of such legatees or distributees, and their inability to refund when called, for the security they are, to give is to him for his indemnification The words are: "giving good security, that if any debt or debts truly owing by the deceased shall be afterwards paid for and recovered, or otherwise duly made to appear, that then, and in every such case, he or they shall respectively refund and pay back to the executor or administrator his or her ratable part of that debt or debts, with the charges of the executor or administrator by reason of such debt or debts, out of the part or share allotted to him or her, thereby to enable the said executor or administrator to pay and satisfy the said debt or debts, so discovered after distribution made as aforesaid." The executor could not plead fully administered, and support it by proof of the distribution. He was liable to pay the creditor de bonis propriis, assets having once come his hands; and could never be reimbursed if the obligees became unable to refund. This evil was attempted to be removed by the limitation of seven years. Experience showed that insolvencies happened within the time, by which, as also by the removal or death of the obligees and sureties, and by dispersion of their estates into various hands, and to various parts of the world, executors and administrators were oftentimes much injured. The Act of 1789, c. 23, endeavored to cure these evils. It gave a longer time for administration, two years instead of one. So far the Act of 1715 is altered. At the end of this time, they required from the legatees and distributees a bond for refunding, made payable to the chair man, for the use of the creditors; after this they were not bound to give bond to the executor or administrator. So far also is the former law changed.
After these bonds are taken and lodged in the office and recorded, the executor may plead fully administered; no assets; or not sufficient assets, to *Page 233 
satisfy the plaintiff's demand. And if such plea be found in his favor, the creditor shall proceed by sci. fa. on the bonds. Here is a complete alteration of the law from what it was, in the obligee, the plea of fully administered, the sci. fa. by the creditor, and the discharge of the executor or administrator. He needs not any limitation after this, for if he has distributed and taken bonds he may plead fully administered; if he has not distributed the assets are in his hands. The provision made in his favor by the limitation of seven years is suspended by another and better provision within the purview or body of both acts. And it is repealed because the Act of 1789, c. 23, section 6, declares void and of no effect "all laws and parts of laws, within the purview and meaning thereof." The assembly meant to provide for the executor by giving him the plea of fully administered, and by referring the creditor to the bond of the legatees and distributees in place of protecting him by the seven years limitation. If he pursues the Act of 1789, c. 23, section 2, it is impossible that he can ever need the Act of 1715, or ever have cause to plead it. This is a provision on the same subject; both acts have the same object in view, and it is better accomplished by the latter than the former law. The danger to executors from the inability, death, and removal of legatees and their sureties, is completely obviated; and by other means than the seven years' limitation. Dos not the legislature, in these particulars, legislate upon the same subjects, with the same view, and having the same objects before them in both these acts? Do they not plainly fall within the words and meaning of the Act of 1789, c. 23.
It is said the whole effect and operation of the Act of 1789, c. 23, depends upon the advertisement required in section 5; and that it is only operative where such advertisement is made. If it be so, the inference is admitted to be correct; and that leads to *Page 234 
another inference, that it is not a repeal of the Act of 1715. Can it be the meaning of the legislature to render the whole act void if the advertisement be not made? Consider in whose favor is the limitation contained in section 4: "Creditors of any person deceased, if resident within the State, shall within two years, and if without the State shall within three years from the qualification. c., exhibit and demand, c., and if they fail to sue within these periods shall be barred. There is a saying for infants, persons non composmentis, and femes covert. It is not for the benefit of executors or administrators; for they are protected by the bond and preceding provisions of the act. It is for the benefit of legatees and distributees who give bond. They are not to be for ever liable; but are free from the demands of creditors if they do not sue within the prescribed time. Here also is a new provision not embraced in the former act. Will the legatees and distributees, and their sureties lose the benefit of this limitation, and be left exposed for ever to creditors, merely because the executor fails to comply with the requisitions of the law upon him? That is too much power to vest in him, especially when it is considered that this is not the only mode of giving notice to those concerned, and that the information to be conveyed through the medium of publication is not, in one time out of a thousand, the only medium through which it is conveyed. It is provided for the greater caution; but it is not a sine qua non. Surely the law ought not to be do construed as to make the directions in section 5, a precedent condition, and thereby place it in the power of the executor to give to the legatees and distributees the benefit of the limitation in their favor or not at his pleasure. At all events, is a condition precedent, it should not be any further so than the creditor has suffered, or is likely, to suffer, by the non-performance of the condition. If he has notice without the advertisement, he *Page 235 
ought not to be excused for want of it. And a plea of seven years elapsed, and no suit brought by the creditor, would be a good plea in bar, unless he could reply no advertisement, and no notice by any other means, which averment could hardly ever be made; for the death of every man is heard of, some more extensively than the advertisement of their executor. The fifth clause, therefore, can not be conditional. It is directory, like the law for advertising sales which administrators or guardians are required to make. Again, if it toe a condition precedent, then in case of failure the creditors are not bound, and then the exception in favor of persons under disabilities can not take place. If none are barred, none can be excepted from the bar. And then disabled creditors will be barred in seven years by the Act of 1715, who would not be barred after seven years until the removal of their disabilities toy the Act of 1789. Thus a favored class of creditors will be deprived of the privileges given to them by the Act of 1789, for no fault of their own, but by the culpable neglect of the executor, who has not the inducement of present benefit, nor the dread of personal inconvenience, to urge him to his duty. That can not be the true construction of an act which leads to such a result. Their privileges, so valuable and important to them, can not be dependent upon the mere whim and caprice of the executor or administrator, as they would be if they were to be enjoyed or not, as he thought proper to advertise or not. The advertisement is really in its own nature almost wholly unimportant, and, when its ends may be accomplished in most instances as well without as with the publication required, it is impossible that the Legislature could have intended to make the whole act and all the effect of it depend upon such publication. They could not intend to place the legatees completely in the power of the executor, so as to make the plea of this limitation depend upon a contingency so *Page 236 
precarious to the legatee, at the same time that the executor was safe, whether he published or not, by his plea of fully administered. Either this is the case, or for want of the advertisement the bond and security given to the chairman is also void; which breeds still greater confusion, and has not yet been advocated, but is a consequence deducible from the conditionality of the fifth section. So many difficulties show manifestly that the fifth section is not conditional; and that the Act of 1789, c. 23 takes effect whether the advertisement be made or not. And then what need is there for the seven years' limitation? If the executor after two years, and distribution made and bond taken and recorded, can not be liable to a creditor, how is it possible that the same act which exempts him from the action of the creditor can also provide for him by a limitation of time in case he should be sued by a creditor? Let us try another experiment whether the seven years' limitation be in force or not. A., a married woman, is the creditor of B. He dies, and seven years expire, and then the husband of A. dies; can A. recover against the executors of B? If she can recover, then the seven years' limitation is not in force; for that is a positive bar to her: and if she can not recover then the Act of 1789, c. 23, is not in force, for it positively enables her to recover after tie removal of her disability. And if one or the other must be of no effect, all will agree that it is the Act of 1715.
After going thus far, there yet remains great difficulties to encounter. The adjudications of the Supreme Court of the United States, and of the Court of North Carolina, are, upon this point, adverse to each other. One decision of the Supreme Court of this State doubts which of the two is right, and another decision of our Supreme Court joins the opinion of the North Carolina judges. There is no hesitation in saying we should follow the decision of the *Page 237 
Supreme Court of this State. Where is the mischief if we adhere to the opinion that the seven years' limitation is not repealed, and also to our previous opinion that the Act of 1789 is absolute and the fifth section directory? The people will still have the benefit of the Act of 1789, and creditors will not be bound by the Act of 1715, in such cases where they are allowed by 1789, c. 23, to sue after the removal of their disabilities. We ought to be bound by precedent in cases where much harm will not follow an adherence to it. Uniformity is of more value than the attainment of small advantages acquired by deranging it. Thus far we ought to go, and to hold both acts to be in force unless in parts where they are positively irreconcilable, and then adhere to the directions of the act last passed into a law. In this view, the plea may be good, and if a proper affidavit be made to evince a belief of its verity, it ought to be remanded for an issue to be joined upon it. If no such affidavit be made before the end of this term, then judgment ought to be entered for the plaintiff.
It will not be amiss now to say something of heirs and of the real estate; and how they are affected, if at all, by these acts, — this subject being intimately connected with the other which we have just considered.
In the year 1715, an heir could not be sued upon a judgment against his ancestor; for the bond was merged in the judgment. He could only be proceeded against by sci. fa. founded upon the judgment, and be subjected by execution to an extent of one moiety of the land, which the creditor should hold as a tenant by elegit. The executor was bound to pay it, if he had assets, in preference to most other debts, and could be sued upon it. If no judgment were given against the ancestorr, the heir could not be sued except upon a bond in which the ancestor and his heir were specially named. As to all other debts *Page 238 
by specialty or single contract, he was not liable to be sued. The Act of 1715 could not bar the creditors from suing the heir upon them after a certain lapse of time, since upon them he could not be sued at all. As to the debt day by bound, in which he was specially named, the creditor might sue the heir or executor at election. The present assets were bound to retribute the heir if the creditor forced payment from him instead of the executor. 2 Viner, 120, 469, 477; 2 Vent, 349; 14 Viner, Heir, letter U.; 2 Com. Dig. Chancery, 3, P. 3; 2 Vern. 43; Hard. 512. The personal estate is the primary fund for the payment of debts, and has been considered so from the earliest periods of our juridical history to this day. The heir could not plead that there was an executor or administrator, or that he had assets. The judgment against him bound his lands from the day the writ issued against him, and the whole of his lands were liable, and not a moiety only. A devise or alienation by the ancestor did not hinder the plaintiff's remedy, being remedied by the 3 4 W. M. c. 5, and the 3 4 W. M. c. 14. An alienation made by deed, a devise for the payment of debts remained as at common law. Vide
3 Lowry, 119; 2 Saund. 7, note 4; 5 Com. Dig. Pleader, 2, E. 3; Dy. 204. Thus stood the law concerning the heir in 1715. In that single case in which the heir was liable to be sued, the personal estate was subject to his reimbursement: and whenever the personal estate became exonerated, so that the creditor could not resort to if, it must of course follow that that could not be done by circuity which could not be done directly, and then either the heir must be discharged simultaneously with the personal estate, or the personal estate to be exonerated by throwing the burden on the real estate, which latter is directly against the rule of law which exonerates the real estate by throwing the burden ultimately on the personal estate; and then if either this ancient rule must *Page 239 
be abolished or the bar be extended to the heir also, the latter alternative ought to be embraced, considering the long continuance of the rule, and the tenacity with which our laws have adhered to it to this day. Were we not to decide so, then a creditor, by delaying to make claim till after the limited time, might discharge the personal estate, and impose the burden of payment upon the real estate, making it the only ultimate fund where by law it is only the secondary one. And if this be so with respect to obligations in which the heir is specially bound, much move ought it to be so with respect to the new debts, to which he is made liable by the 5 Geo. II. c. 3. That law subjects the heir to all just debts, in like manner as he was before liable for specially debts in which he was specially named, to be levied by executor as upon personal estate. Before this act the personal estate alone was liable to these demands. After the act it was the primary but not the only fund. Lands in some of the provinces were sold by executors under this act as chattels. In North Carolina, however, the personal estate was considered as the primary found, out of which eventually payment was to be made and that idea is expressly recognized by the Act of 1777, c. 2, section 29. The Sheriff is to levy his fi. fa. in the first place upon the goods and chattels, if any there be; and in 1784, c. 11, section 5, the heir may plead that the executor or administrator has not fully administered. The same idea is preserved, 1789, c. 39, section 1. If the real estate could not be sold in the lifetime of the debtor so long as there was any personal estate to be found on his death it continued first liable still, and, by the Act of 1784, the heir was allowed to plead, what formerly he could not plead, that the executors had assets. What would be his defence if he were first sued by the creditor, passing over the executor? Might he not plead assets in the hands of the executor as well as he could plead it to a sci. fa. upon a judgment against, the *Page 240 
executor? Why not in the latter case as well as; in the former, at least with respect to such debts as he was made liable to by the Act of Geo. II. The executor, having the possess on of the papers and writings of the testator, can better defend himself against them than the heir who has not the possession, nor any means to obtain the possession of them. Convenience points out this course as preferable to the expensive one of suing the heir and recovering against him, leaving him to sue the executor for his reimbursement. The result of these reflections is, that if the personal estate must first be resorted to, and judgment be obtained upon the plea of fully administered as a foundation for the sci. fa against the heir before he can proceed against them; a bar to the creditor, as against the personal estate, must also be a bar as to the real estate, which can not be reached but by means of the sci. fa.; and that can not issue but upon a judgment founded upon a full administration, which can not be rendered when the creditor is barred by the act of limitations.
This limitation would be nugatory if the creditor could recover against the heir, and he against the executor or distributee, and would wholly overthrow the rule that the real estate should not be liable so long as any personal remains. It would turn the creditor from the personal to the real estate, exonerating the former and charging the latter against the spirit of our laws, exhibited in so many arts of assembly and judicial decisions as to have become a fundamental rule of our jurisprudence, which ought not to be superseded by conjecture, and has a far better claim to preservation than the creditor has to a non-extension of the limitation beyond the personal estate. The conclusion is, that where the creditor is barred ed as to the personal estate he also is barred as to the real estate, and of course that there is a new provision by the Act of 1789 upon this subject, differing from that of 1715, for, if barred in two or three years, he must of *Page 241 
necessity be barred in less than seven, and can never have occasion to correct. Still, however, it may do no harm to consider the seven years limitation as in force, leaving it to the choice of heirs to use it in preference to a shorter time if they choose to do so. It is probable, therefore, that the real estate is protected by these acts of limitation as well as the personal estates, and becomes discharged whenever the personal estate does; that is to say, at least from all such actions as are made to be against the heir and real estate by the statute of Geo. II., improved and amended by subsequent statutes.
Affirm the judgment of the Circuit Court.